JOHN M. FOLEY et al.

v.

C. J. TYLER et al.

|161   167|
| 92a  ²504|

*Filed at Ottawa March 28, 1896.*

1. ELECTIONS—*when findings of county court in election contest will stand.* A finding by the county court that during a count of votes cast at a village election seven ballots were taken from the floor of the room and mingled with the ballots in the box and counted for the respondents in the contest, and a like number cast for the contestants withdrawn to make the whole number correspond with the poll-book, whereby the respondents were wrongfully declared elected by the judges, will not be disturbed on appeal, when supported by the evidence.

2. SAME—*county courts have no jurisdiction to determine contested election for village trustees.* The board of trustees of a village has, under the statute, (City and Village act, art. 3, sec. 6, and art. 11, secs. 8, 9,) power to judge of the election and qualification of its own members, and the county courts have no jurisdiction to determine contests as to the election of such trustees.

APPEAL from the County Court of Cook county; the Hon. O. N. CARTER, Judge, presiding.

At the annual election of officers of the village of Evergreen Park, Cook county, Illinois, on the 16th day of April, 1895, two tickets were voted, one headed "Republican" and the other "Citizens." On the first, C. J. Tyler was the candidate for president of the village board, Samuel Overton, F. D. Webb and Nels Parsons candidates for trustees, and B. L. Mead candidate for village clerk. On the other, J. M. Foley for president, Herman Kuschel, Andrew Olin and Edward F. Lowell for trustees, and Fremont W. Gunderson for clerk, the then incumbents, were candidates for re-election. The issue between the two sets of candidates was purely a local one, relating mainly to the sale of intoxicating liquors in the village, those on the so-called republican ticket favoring a more rigid enforcement of the law regulating such sales. The judges of the election declared the result to be the election of

the candidates on the citizens' ticket, counting to each of them one hundred votes and to those on the other ticket but ninety. Thereupon those declared elected qualified, and assumed the duties of the respective offices for which they were candidates, and appellees, candidates on the other ticket, filed this petition to contest their election.

Appellees charge in their petition "that after the close of the polls a count of the ballots showed ninety-seven votes for each of the petitioners and ninety-three votes for each of the respondents. There were one hundred and ninety names on the poll-book, and the result of three counts corresponded with the poll-book. After the count of the ballots, certain persons, * * * none of them voters or residents of said village, but who had been admitted by the election officers to the canvass of the votes, pretended to find upon the floor certain alleged ballots which they claimed had been dropped from the ballot-box during the canvass. The republican challenger and watchers of the count called attention to the fact that all said ballots were citizens' ballots and had been found by men acting for citizens' candidates, and protested that no ballots had been dropped, but the number of ballots counted corresponded with the number of voters on the poll-list." It is then alleged that thereupon, on the suggestion of one of the parties interested in the citizens' ticket, the room was cleared and the challenger for petitioners expelled, against their protest, and not re-admitted into the room until the final proclamation of the result by the judges, while other parties, representing the citizens' ticket, were re-admitted; that "the election officers unlawfully and fraudulently withdrew from the ballots lawfully cast not less than seven ballots cast for petitioners, and fraudulently intermingled with the legal ballots not less than seven ballots alleged to have been found on the floor, and wrongfully and fraudulently counted and returned said ballots for the respondents."

It is further alleged that the conduct of the election, as alleged, was in pursuance of a plan and combination to bring about the re-election of the defendants; that all the judges of the election were selected from the citizens' party by the village board, who refused to allow any member thereon from the petitioners' ticket; also that in pursuance of said unlawful plan and combination about fifty illegal voters were brought into the village, who were allowed to vote the citizens' ticket, over challenges made on behalf of petitioners.

The answer admits that the total number of votes cast was one hundred and ninety, but denies that the republican candidates received ninety-seven and the citizens' candidates but ninety-three of those votes, and denies that the republican candidates were lawfully elected; denies the charges of wrongful or fraudulent conduct on the part of the election officers, and that any votes were counted which had not been cast, and that seven ballots legally cast were removed and destroyed; denies that any fraudulent votes were cast for the citizens' ticket, and alleges that not less than twenty-five illegal votes were counted and returned for the republican candidates, which, if expunged from the returns, would show petitioners received that many votes less than were returned for them; denies that "the count of the ballots showed ninety-seven votes for the republican candidates and ninety-three votes for the citizens' candidates, but admits that there were one hundred and ninety names on the poll-book; states that the count showed one hundred and ninety-eight ballots cast; that one of said ballots was found by the judges to be informal and irregular, and was rejected; that the number of ballots still exceeding the number of names entered on the poll-list, they were replaced in the box, the box was closed and was shaken and again opened, and that one of the judges drew out and destroyed seven ballots, and thereupon, the ballots and poll-list agreeing, the judges counted the votes and

announced the result as provided by law." It further
denies the allegation of the petition as to the finding of
ballots upon the floor, and alleges that the republican
challenger and watchers were expelled from the room
because of their refusal to maintain order. The remain-
ing portions of the answer are general denials of the
allegations of the petition.

A replication being filed, the cause was heard on the
testimony of witnesses introduced by the respective par-
ties in open court. On the 6th of September, 1895, the
court entered its decision in the case, finding the follow-
ing facts: That one hundred and ninety ballots were
cast at the election, of which ninety-seven were repub-
lican and ninety-three were citizens'; that during the
count, seven ballots, all marked for the citizens' candi-
dates, were picked up from the floor of the polling place
which had not been legally cast at the election, and
which the judges wrongfully intermingled with those
taken from the ballot-box and counted and returned for
the citizens' candidates; that they wrongfully and unlaw-
fully withdrew from the ballots seven cast for the repub-
lican candidates; that the seven found upon the floor
were not regularly cast, were never in the ballot-box and
should not have been counted; that the returns of the
election should have shown ninety-seven ballots for each
and every republican candidate and ninety-three ballots
for each and every citizens' candidate; also, that all the
members of the village board, including the president
and clerk, were in sympathy with the citizens' party;
that the village board wrongfully and illegally refused
to appoint a representative of the republican party as a
judge or clerk of election, and that all the judges and
clerks were members of the citizens' party; that during
the count of the ballots, and before the result was de-
clared, the republican challenger and watchers were
wrongfully ejected from the polling place upon the order
of the election officers and not thereafter allowed en-

trance into said polling place during the count of the ballots. On this finding of fact it was held that the court was without jurisdiction to determine the contest as to the election of village trustees; that a majority of the legal votes cast at said election were for C. J. Tyler as president of the village board and B. L. Mead as village clerk, and should have been so counted and returned; ordering that the petition be dismissed for want of jurisdiction as to petitioners therein as candidates for village trustees, and declaring C. J. Tyler duly elected to the office of president of the board of trustees and B. L. Mead to that of village clerk. From that order this appeal is prosecuted, appellees assigning cross-errors on the ruling of the court below that it had no jurisdiction to determine the right of petitioners to the office of village trustees.

W. E. THORNE, and JOHN J. COBURN, for appellants.

JOHN T. BAILEY, ROBERT C. MORSE, and GLENN E. PLUMB, for appellees.

Mr. JUSTICE WILKIN delivered the opinion of the court:

It is first objected that incompetent testimony was admitted and competent testimony excluded upon the hearing of the case. We find no material error in the rulings of the court below upon either of these questions. If it were otherwise, and all that is insisted upon under these assignments of error sustained, the substantial merits of the case would not be affected or the result changed.

The only other ground of reversal urged is, that the finding of the court below is against the weight of the evidence, and the claim made under it is, that the answer, denying that illegal votes were cast for the defendants and averring that fraudulent and illegal votes were counted for petitioners, was sustained by the proofs. Each one of the votes claimed to have been illegally

counted for the republican ticket is pointed out in the argument of counsel. The objection to most of them is, that the voters were not residents of the village and that some of them were paid to vote that ticket. We have examined the testimony relied upon to sustain this contention, and find as to a considerable number of them no satisfactory evidence that they voted at the election at all. As to others, the conclusion that they voted for petitioners is based on mere inference or conjecture. On the other hand, petitioners introduced evidence in support of their allegation that some fifty persons brought into the village for that purpose fraudulently and illegally voted for the defendants. There is evidence tending to show that men were induced to gain a fictitious residence in the village for the purpose of voting at this election, and that both parties, to at least some extent, resorted to that unlawful and reprehensible method of gaining votes; but it cannot be definitely determined how many, if any, ballots should have been thrown out for that reason. The finding below is to the effect that all the ballots actually cast were legal, and this we think was as favorable to the defendants as they could reasonably ask under the evidence. It cannot, we think, be seriously contended that, when all the testimony bearing on the question is considered, the allegations of the petitioners as to illegal votes is not as fully sustained as those of the answer. Manifestly, the right of petitioners Tyler and Mead to the offices to which they were declared elected by the county court, was based upon the fraudulent and illegal conduct of the election board in counting seven ballots for the citizens' ticket which were not voted, and destroying a like number actually cast for petitioners, and that its order on that ground is fully sustained by the evidence cannot be questioned.

It is overwhelmingly established by the testimony, that immediately after the polls were closed all the ballots were taken out of the box by the judges and placed

upon the table at which the officers of the election sat. They were then counted, and the whole number found to be one hundred and ninety, which corresponds with the whole number of votes cast, as shown by the poll-book. They were then divided, still remaining on the table, and those cast for each party placed in separate piles, and counted as they were divided. That this count showed ninety-seven ballots for each of the candidates on the republican ticket and but ninety-three for each of those on the citizens' ticket is proven beyond all reasonable doubt. It is also clearly established that just as the last ballot was being counted, a bystander, having no right there, so far as the proof shows, called attention to the fact that certain ballots were upon the floor. There is no direct proof of the fact, but the circumstances strongly indicate that he, or some one acting with him in the interest of the citizens' ticket, at that moment secretly dropped them near the table,—at least there is no pretense of direct proof that they fell from the ballot-box or table. The judges took up those ballots, which they say were seven in number, and after excluding from the room the republican challenger and watchers, who objected to their being counted, (which exclusion they claim was on account of disorderly conduct,) and calling in a representative of the defendant J. M. Foley, (who they pretend was village attorney, but who does not himself say so, and admits he was there solely in the interest of Foley and consulting with him,) put the ballots taken from the floor, in the box, with the one hundred and ninety already counted, and, as they would have the court believe, after thoroughly shaking them up, drew out and destroyed seven ballots, leaving in the box one hundred and ninety, —the whole number voted, as shown by the poll-book. These they counted, declaring the result to be one hundred votes for each of the candidates on the citizens' ticket and but ninety for each of those on the republican ticket.

It will be seen from the foregoing statement, that defendants, by their answer, admit there were but one hundred and ninety votes cast, as shown by the poll-book, but claim the count showed one hundred and ninety-eight. They do not deny the allegation of the petition that seven of that one hundred and ninety-eight, all purporting to be votes for the citizens' ticket, were taken from the floor after the whole number taken from the box had been found to correspond with the poll-book. By their own answer and the undenied allegations of the petition, fully sustained by the proof, they are driven to the flimsy pretext, without a particle of evidence to support it, that in taking the ballots from the box in the first place, seven tickets, all being for the citizens' candidates, accidently fell upon the floor, unnoticed by them until their attention was called to them by a third party, and the still more unreasonable contention that upon those ballots being placed in the box with one hundred and ninety others, and thoroughly shaken up, seven were honestly and impartially withdrawn and destroyed, all of which *happened* to be for the candidates on the republican ticket. To ask an impartial mind to believe that these remarkable coincidences were the result of mere accident and in no way brought about by collusion and fraud is an affront to common understanding. The only excuse that is offered for the conclusion that the ballots picked up from the floor had been regularly voted and placed in the box, is the fact that they were properly endorsed on the back, and that the number left, deducted from the whole number received, indicated that one hundred and ninety-eight had been voted. How and where the blank ballots were kept, and what effort, if any, was made to prevent their being wrongfully taken, is in no way explained. In view of the clear, convincing proof that this election board was organized in the interest of the so-called citizens' ticket, that no representative of the other ticket was permitted a place upon it, together with the admitted

careless, not to say criminal, conduct of the judges in canvassing the votes, it is not an unreasonable presumption that some one, either willfully or through negligence, permitted those who discovered the ballots on the floor to get possession of the blanks with which to commit the forgery and consummate a gross fraud. Especially is this true since no reasonable explanation is attempted as to how all these ballots were voted and no record of them kept by the clerk. The most that either of the judges could say was, that they concluded it *may have happened* at a time when a considerable number of votes were being cast. That it did so happen there is no evidence whatever. The clerks do not testify to any fact tending in the slightest degree to show that they did not correctly keep the poll-book.

As to the assignment of cross-errors, we think the county court properly held that it was without jurisdiction to determine the right of the contestants to the offices of village trustees. Section 6, chapter 24, article 3, of the Cities and Villages act, provides that "the city council shall be judge of the election and qualification of its own members." Under that section we have held that county courts have no jurisdiction to hear the contest of an election in respect to the office of alderman, and for the reason that such jurisdiction is conferred upon the city council. (*Linegar* v. *Rittenhouse*, 94 Ill. 208, and cases cited.) By section 8, article 11, of the same chapter, relating to the organization of villages, it is provided that the village board, when organized, shall be considered, in law, a body corporate and politic, "by the name and style of 'The Village of............,'" and "possess all other powers as a corporation in this act conferred upon cities not exceeding five thousand inhabitants, except as herein otherwise expressly provided; and wherever the words 'city council' or 'mayor' occur in this act, the same shall be held to apply to the trustees and president of such village, so far as the same may

be applicable." And the next section also provides that the president of the board of trustees shall perform the duties and exercise the powers conferred upon the mayor of a city not exceeding five thousand inhabitants, "and the trustees shall perform the duties and exercise all the powers conferred upon aldermen in cities, and the president and board of trustees may exercise the same powers conferred upon the mayor and city council of cities not exceeding five thousand inhabitants, and pass ordinances in like manner." These provisions of the statute give the same right to a village board to pass upon the qualifications of its members as is conferred by section 6, *supra*, upon a city council. Whether the provision is a wise one or not we are not authorized to determine.

On the whole record we think the judgment of the county court should be affirmed.        *Judgment affirmed.*